We have four argued cases this morning. The first of these is number 2012-1063 Alex Sam v. IDT Corp. Mr. Summers. Good morning. May it please the court. This was a very unusual case. The plaintiff called two experts to testify at trial. Neither of the experts had performed any investigation of the actual point of sale devices at issue. And neither expert would even say that the key requirements of the governing claim construction had been satisfied. In light of that, the case is clearly controlled by this court's prior decision in Yoon Ja Kim. In fact, this case is far worse than Yoon. In Yoon, the issue was a formula for baking bread involving oxidizing agents. The question was whether the addition of additional ingredients materially affected the quality of the bread. Well, counsel, your argument, as I understand it, you just presented it, was neither expert would even say whether the limitations were met. But it looks like, at least on 13854 and 13855, the one expert was going limitation by limitation through. And the question, in your opinion, does the IDT phone card system meet those limitations? The answer is yes, it does. Explain. And then he would explain. So it looks like, now, maybe you'll argue it's conclusory or that he didn't investigate it sufficient to make those allegations. But it seems that your argument may be a little overly broad, maybe not exactly correct when you're claiming that he didn't even allege that the limitations were met. Yes, I'd like to address that, Your Honor. The expert, Mr. Baker, their principal expert, did say that, in his opinion, the unmodified limitation was satisfied. When asked to explain, it's important to know that there are two requirements of the governing claims construction. First, that the POS devices be of a type in existence prior to July 1997. And second, that they have not been reprogrammed, customized, or otherwise altered with respect to their software or hardware for use in the card system. And what he did, if you look at his testimony, he addressed the first element only. He talked about how these were kind of the same basic things that existed previously. But he never answered the question, have they been reprogrammed, customized, or otherwise altered? He skirted that issue. And that's why I asked him on cross-examination. I said, you haven't expressed any opinions on that subject, have you? And he said, no, because he had dodged it. And it was very clear what he had done. And I think it's very clear from the transcript that while he gave this conclusory opinion as to unmodified, he did not address the second and really the critical disputed aspect of the claim construction. So he didn't investigate the software on the POS devices? He never looked at the POS devices, never investigated the software to see if they had been changed. But wasn't his testimony simply that he saw it at the checkout counter being used? That is the second expert. It's kind of hard to figure out what software is inside a machine when you're looking at the outside. Precisely. That's the second expert, Raneke, who was brought in as the POS guy to fill the gap. He had been a salesman of point-of-sale devices, had no technical training, didn't know anything about software, no computer science background, and he did allegedly three things. One, he looked at certain documents that had been provided to him. We don't know what those were. It was unspecified. Number two, he walked into a Walgreens store, bought a card, and saw that it was activated. That, of course, gave him no insight into whether these big POS devices that have a personal computer at Walgreens, whether they were custom or reprogrammed, gave him no insight into that. And then he did a third thing. He brought in a little POS device to trial. He swiped a card through it, and after some initial foibles, was able to show that it read an IDT card. That, again, answered nothing about whether the device was actually used. This was his device, an old device he had had at home. It didn't answer the question whether the real devices in use in the alleged systems had been reprogrammed to route that message, not to read the card. We know POS devices can read cards. He answered, you know, truism. The question was whether they'd been reprogrammed to send the activation message to the Walgreens host computer or the EWI host and on to IDT. He really presented no evidence relevant to the operative plan construction. Neither expert did. Well, speaking of the lack of evidence, let's talk about the obviousness issue, where you didn't have an expert to testify that the combination was obvious, right? That is true, Your Honor. I think, first and foremost, this patent, the invention, is relatively simple. It is not difficult for this court to understand. And if we look at two references— I'm not sure that's true, but go ahead. I think if we look at two very simple portions of the references of Levine and Lorsch, we see everything. If we look at columns two and columns four of Levine, we see the cards are encoded with a BIM. We see that the activation message is routed over VisaNet, the banking network, which is really what was heralded. What you're basically asking us to do is two things. One, even though you had no expert testimony on obviousness, you're asking us to conclude from the references that there's a motivation to combine them. And you're asking us to read the references contrary to the expert presented by the other side, who did testify that there were things missing in those references. And, for example, he said they were all closed systems.  A few things, Your Honor. First, we did have expert testimony. Our expert testified. On anticipation. On anticipation. And he said that he also viewed Levine by itself, just with the ordinary skill of a skilled artisan, would see that the invention was obvious. In essence, he argued obviousness based on Levine and just a little bit of common sense. Secondarily, though, the disclosure— He didn't address obviousness. He did, Your Honor. He did. After finishing his testimony about anticipation, he said if there are any minor differences, the differences are so insubstantial that this would have been obvious. So it's just that conclusory statement? It was, Your Honor. Keeping in mind, our principal defense in this case, going into it, was non-infringement. The court announced its sanction while their expert was on the stand halfway through trial. And this was a very rushed trial. I think we had four and a half trial days. And we were on a clock. The testimony was very compressed. It was that, Your Honor. But if we look at these references, it's crystal clear. I mean, the only thing that was really disputed— Well, the line doesn't disclose a point-of-sale terminal. I mean, I've read the prior art. Show me exactly where it discloses a point-of-sale terminal. Oh, well, Levine talks about the—Levine does reference a point-of-sale terminal, Your Honor. If we look at column—if we look at column four— You're talking about the description of figure three? Yes, the description of figure three. Which page is this on? This would be in the blue brief, 19018. So where is the discussion of a point-of-sale terminal? At line 34, it says, The sales agent selects an ETC card and enters its serial number into a terminal. Which could be a telephone. A telephone has never, in any piece of prior art, been described as a point-of-sale terminal for credit card swiping machines or other things. The claims in this case do not require swiping. They mention swiping in their brief. There's nothing in the claims that requires swiping. I see no evidence anywhere in this record that a telephone is a point-of-sale device. It's not a point-of-sale device in my mind. It's not a point-of-sale device reading the references that you put forward and you didn't introduce any testimony that one of us still in the art would understand a telephone as a point-of-sale device. The entire process here was to swipe it at the point-of-sale. This involves the clerk having to pick up the phone call, relay a bunch of serial numbers and other information, and then get something back. I mean, this seems pretty different. Well, again, the claims don't require swiping, but if we look at column 2 of the theme, in the summary of the invention, at line 32, it says, When a customer purchases a card, the sales agent uses local software to remotely transmit to the central database the card number or a serial number. I would submit that that does, to one of skill in the art, suggest that we are dealing with a point-of-sale device more intelligent than a telephone. Wait a minute. But you live by, for infringement purposes, the unmodified point-of-sale device with no specialized software, no specialized hardware. So you've got to live with it on validity. If you want it for infringement, you've got to live with it on validity. And this talks about using local software to remotely transmit. There's nothing about this that tells me this is going to be unmodified standard software present at the point-of-sale device. I would submit that Levine shows there are multiple embodiments disclosed, and that Levine shows you can use a wide range of point-of-sale devices, from something as dumb as a telephone to something as smart as a personal computer. But you haven't proven that a telephone is a point-of-sale device. Go ahead. Keep going. If not shown in Levine, I would direct the court's attendant to a very important portion of the Lorsch reference. If we look at page 19028, which is also included in the blue brief, this is column 6 of Lorsch. If we look at the portion beginning at line 45, we see clearly an unmodified point-of-sale device being referenced, the Verifone. And if we look again at line 61 to 65, it says it should require no additional hardware. So I would submit that Levine clearly shows an unmodified point-of-sale device. And if we look at the language in between... This makes me uncomfortable. In WIRES and a few other cases, we've said that where there's simple technology, that we can look at the patents and make those conclusions. But what we end up with is patents which may not be clear. In fact, we're now arguing about what they show, and it would be nice to have someone skilled in the art who is an expert to say, well, this is the right way to read them. And the problem is we don't have that. We end up with lawyer arguments, which isn't very satisfactory in some ways. I understand the court's concern, Robert, but I do believe the disclosures in Levine are very close. One thing to keep in mind, this is also unusual. Both of these patents are directed specifically to point-of-sale activation of stored-value cards, phone cards, gift cards, the way in which you activate them from a point-of-sale to avoid theft. So these references are right on the same subject. They're right there together. And one looking to create one of these systems would clearly have been interested in reading them both. But the question is what they mean. That's true. Keep in mind also that there was uncontradicted testimony, that everyone understands that credit cards, debit cards, these are all bin-encoded. The basic concepts of using the Dorff Invention were well known. Also, this is clearly a KSR case. Their expert admitted that everything in the alleged invention was in the prior art and that there were no unexpected results. I made a conclusory statement to that effect, but then later on he gave specifics and said that some of these pieces of prior art were missing things that were in the claims. That is true. One additional thing, and I'll move on to the next subject. If we look at Lorsch, Column 6, from lines 54 to 60, we see the transaction processor and processing hub, also very well laid out. It talks about the intermediate host computer moving on to the centralized computer. If I would, I'd like to move on to the sanction, Your Honor. Oh, I'd like to actually first address the issue of direct infringement. You gave me the remodel time, so it's up to you whether to use it or not. Two quick things, Your Honor. On divide infringement, this case is Centillion. In Centillion, we had a front-end computer and we had the back-end processing done by Quest. The court held, as a matter of law, that Quest could not be held liable for direct infringement. We had the exact same situation here. It was undisputed that IDT does not provide the POS devices, has no control over the POS devices, doesn't tell anyone whether to reprogram them or not, and that we're just one of many card companies that provides cards. So I think that's an additional round for non-infringement. Jamal should have been granted on that basis as well. That was all reserved. Thank you. Mr. Maloney. May it please the Court. I want to start where Mr. Summers left off, joint infringement. The standard that he just mentioned from Centillion is not the standard that the jury was instructed on. As the Court knows, Centillion holds that a system claim can be infringed by a single actor if the single actor uses the whole system. And I think the aspect of that holding he just referred to was that theory where it is argued that a single user uses the whole system. Centillion also makes clear that if that showing cannot be made, this Court's joint infringement case law controls system claims equally as it controls method claims. That was the theory the jury was instructed on. The direction and control standard. The law is clear. IDT cannot avoid liability by simply contracting out some steps to third parties. The record was full of evidence that that's exactly what IDT did. All the contracts were in evidence. Mr. Baker, as an industry expert, testified based on that evidence, testimony from IDT's own employees, and other evidence of record that IDT controls the third parties through contractual relationships. Well, what about the problem that there doesn't seem to be any testimony by your witnesses that they examined the software and concluded that it was unmodified? Sure. So we're talking about the unmodified retail point and sale device limitation. And I want to step back if I could and then answer your question. There's no claim construction issue on appeal. Is this issue only with respect to the Walgreens and EWI? The only point that IDT has argued in their briefs related to EWI retailers and Walgreens. As to the safe net, the defense's license, right? There was a post-trial ruling that there was a sub-license for that system. So as to the Walgreens and EWI, where's the evidence that it was unmodified software? Okay. The evidence is of a wide variety. Qualified expert testimony from both Mr. Frannike. You're going to have to show us. Show us the actual testimony because I read a lot of this testimony. I don't see any testimony where he says, I was familiar with the software and it wasn't modified. Where do I find that testimony? Well, I want to answer your question, but if I may, there's no requirement under the claim construction that the actual software be physically inspected by anybody. No, but there's a requirement that it has to be unmodified and you have the burden of proving that theirs is unmodified. Right. So where do you put forth any evidence at all that the software is unmodified? Sure, we did. In the form of direct evidence? Circumstantial evidence. You have to show us where. Well, Mr. Baker's testimony. Your statements are not enough. You've got to show us where in the records and point it. Well, Mr. Baker's testimony on the issue starts really with his background about point-of-sale terminals and how they function. Where does he testify that he examined the software and found it was unmodified? Where does he say that? He didn't testify that he examined the software. He testified that he followed the claim construction and that under the claim construction and all of the evidence that he did inspect and all of the evidence that was and wasn't produced by IDT and based on his understanding of the standard features of retail point-of-sale software and the fact that IDT encoded its cards in a standard manner, the same way that credit cards are encoded, that all of the steps required to practice the claim were, in fact, performed by these devices without any modification to their software or to their hardware. Where does he say that? Without any modification to their software or hardware. Well, he says multiple times in his testimony that he followed the claim construction. It was read to him. Let's start with one. Okay. What page? Of where? Well, for example, at JA13856. Let's look on this. This is volume four. This is one example of Mr. Baker walking through the claims. He was working with the claim chart. What page are you at again? 13855. Okay. Mr. Baker's testimony came in through a claim chart where he had already explained that he followed the claim construction. What line are we talking about here? Starting at the bottom of 13855, carrying over into 13856, he testifies that these cards were activated at the terminal that existed in July 1997 with respect to their ability to read the magnetic strip and send that information on without any modification made to the terminal in that respect. That is one representative example of how he explained his opinion that the claim construction is satisfied. And I do want to emphasize. But your opponent's argument is that is all well and good, and it's a statement that the point-of-sale hardware is the same, but you can't look at a black box and know if the software is the same. And on cross-examination, the same witness admitted he had no knowledge of how the underlying software operated in these machines. If I could go back to the claim construction to answer your question. The claim construction does not prevent any modification from having been made to the terminals. All of the experts agreed that point-of-sale terminals are from time to time updated for various reasons. They are computers. They run software. The claim construction only prohibits modifications that are reprogramming or altering the software for use in the card system. And the whole invention, the whole point of the invention, is if you use standard cards and connect your central account-managing computer into an intermediate network as opposed to the closed systems where they're connected directly to the terminals, that standard terminals can read these cards and send the transaction through the network to the processing hub. Mr. Brannake? Where does he say that the software was unmodified? Because on 13903 on cross-examination, he says he didn't express an opinion on that subject, that is, on the modification thing, and he says no, he didn't. That question and answer has to be viewed in the context of the full record. He had just gotten done testifying for several hours that he followed the claim construction and he explained all of the evidence that supports his opinion that under the claim construction, these terminals, in fact, have not been modified for use in the card system. He was then asked on cross... But he didn't examine the software. Did he say he examined the software? He didn't inspect the software, but there's no need to because he was an expert on the way standard point-of-sale terminals are set up to read standard encoded cards and to send all the transactions to the same back-office computer. And what IDT did was practice the invention by connecting its system into that computer. He also relied on the fact that of all of the documents produced by IDT, which included all of their technical documents, their contracts with their retailers, the deposition testimony of their technical witnesses, there was not a shred of evidence in any of that information that related or referenced any modifications that were required  But they did have a witness who testified that there were not modifications, right? Well, Mr. Scheinfeld, who is not a point-of-sale expert, who is an employee of IDT and a biased witness, got up on the stand without any corroborating documents and said that in his view, his unqualified expert view, that Walgreens had to change their terminals to activate the cards. He also described his experience with the software, right? He did not. He said he provided information to Walgreens and all he testified to was he provided them the UPC codes, which are just the product codes that any company has to provide to a retailer. I thought he spoke to Walgreens on this. I'm sorry, Your Honor. I thought he worked with Walgreens on this stuff. He testified very vaguely that Walgreens asked him for some information. Other than that, his testimony was that Walgreens must have modified their terminals to set a prompt to the clerk that says swipe the card. Well, Mr. Hranicki and Mr. Baker had already testified to the basic functions of point-of-sale terminals, including displaying information on a screen. Mr. Hranicki specifically explained that any time a card is swiped, the terminal inherently sends a signal out to the network and doesn't do anything else. It waits for a response. And that's exactly what Mr. Scheinfeld described happened at Walgreens. It doesn't prove a software modification was required. In fact, the jury was able to rely on our expert's testimony that all of the functions that were described by Mr. Scheinfeld and Mr. Wilkinson, their expert, are standard point-of-sale device functions. They come with the terminal. You don't have to modify the terminal to provide that function, the same way as I don't have to modify my laptop computer to open up the word processor. But you can have software modifications that perform the same function, right? There's no evidence of any. But in theory, you could have a function that's performed different ways by different software, right? In theory, but that's not the facts of this case. The facts of this case are that, first of all, the claims only require the terminal to accept the entry of this card data and send it along to the next computer. That's the whole idea of the invention. And that's the context in which the claim construction lives. The IDT systems all practice the invention by providing standard cards that can be used in standard terminals. If there were actual modifications made to these terminals in order to activate IDT's cards, there would have been a record of it. They produce 30 million documents, including all of their contracts with the retailers, all of their technical specifications. We asked about these subjects in interrogatories and in depositions, and there was absolutely not a shred of information about any modification. The absence of those records... The district court with respect to Walgreens, as I understand it, refused to allow some of the testimony, right? Well, what he did was he struck subpoenas that had been served belatedly by IDT and were improperly served.  And because that discovery was improper, he didn't let the expert rely on it. But he did let Mr. Scheinfeld talk about what he knew about Walgreens. But again, the jury was entitled to not pay any attention to Scheinfeld's testimony. Again, the claim construction is not in dispute. The jury instruction is not in dispute. There's no issue about the inclusion or exclusion of evidence. So the standard is substantial evidence. There just needs to be a scintilla, more than a scintilla of evidence. And as this court knows, that means the jury was free to disregard the testimony of Scheinfeld, the testimony of Wilkinson, none of which was supported by a shred of documentation, and infer from that strong circumstantial evidence and the testimony of our experts as to how these devices operate, how they can swipe any credit card in the world or any prepaid card that is encoded like a credit card and process the transaction through the system the same way as they always have for credit cards. So you're saying the ability to swipe shows that the software was unmodified. That's part of it. The ability to read the standard card is a native function of every standard point-of-sale device in the world. But as your opponent pointed out, it doesn't just have to swipe. It has to send the activation data to the transaction processor and all of that. And how do we know the internal software wasn't modified in order to enable that to happen? Because our experts analyzed all the information about how IDT connected its computer. Again, if you think about it from where IDT sits, they have a card system and a central computer. They want people to be able to enter the data into their computer when they buy the card to activate it. What did they do? They didn't do what the prior art taught, which was connect the central IDT system to every individual terminal. When you do that, you have to modify that terminal to make it do something different than it normally does. But why does it follow from that that the software was unmodified? Thank you for the question. Because it follows because IDT instead connected to Walgreens and all these other retailers' central system or to a network like EWI. The data that the claim calls for goes from the terminal to that system. And the testimony of all of the experts was including Mr. Wilkinson, their expert, and Mr. Sheinfeld agreed. No modifications were required for the standard device to take that data from the card, create a message out of it, and send it to that same central computer. That's the whole point of the invention. No modification was required is not the same thing as no modification was made. I agree with you. But the first step is no modification was required because standard functions are involved. The second step is, was any modification actually made? The jury was entitled to consider both the testimony of the experts that they saw nothing to suggest any modifications, IDT's failure to produce a single document that reflects any documentation was made, and the fact that the type of changes that their expert and Mr. Sheinfeld talked about don't require reprogramming. You don't reprogram a terminal to display something on the machine. So the jury considered all that information, and there was substantial evidence to support their verdict. You don't have much time. Are there a couple other things that you want to address before you sit down? Of course, Your Honor. On the prior art, I think the court's thinking exactly the same way we are. There's substantial evidence to support the verdict on the prior art. As to the sanction, the briefs dispute what the proper standard is. It was clearly a non-dispositive sanction. IDT was allowed to defend the case on multiple grounds. The lower standard of cases like Chilcot applies. Even if this court applies the higher standard of cases like Clear Value, the record contains abundant evidence of severe discovery misconduct that supports the court's discretion to award this particular sanction. Okay. Thank you. Thank you. Your Honor, I'd like to start very briefly with that last point, and there's something that happens in their briefs that I want to make sure does not permeate the court's decision. They accuse us in their briefs of lots of misconduct, lots of misconduct that the District Court never found occurred, and that was not the basis for the sanction. The basis for the sanction was strictly the late disclosure of bins, which was provided over a month before the close of discovery, and a letter to them that identified the specific documents. The court gave you repeated warnings that this sanction was on the table, and you all disregarded them. Well, there was no finding of intentional misconduct or willfulness here, Your Honor. There was a violation for purposes of appeal. We will not challenge that, but the sanction was too severe. A sanction that deprives a litigant of his principal defenses of his day in court should be the last resort. Chilcot, the court, imposed it. It didn't deprive you of all your defenses. It still gave you obviousness and validity. But in a non-infringement case, in an infringement case, infringement is the principal defense. Well, they should have given them the evidence on infringement so they could have built their case in response to it. It seems to me that the sanction was narrowly targeted to exactly the type of evidence you were withholding. Except, Your Honor, that, as you saw, they never took any discovery of Walgreens or EWI. There's no reason to think they need a discovery of these other third parties. The systems were all host-to-host systems just like Walgreens and EWI. There was no prejudice to their case. They were allowed to amend their infringement contentions, amend their damages contentions without any objection. The court did preclude us from addressing the one license defense that was unique to some of these cards. But there was no severe impact to their presentation of the case. And the court could have... The court never even considered whether less severe sanctions would have addressed the conduct and deterred it in the future. A short continuance... Why did you move on to the infringement issue? Turning back to infringement, a couple of quick points, Your Honor. One, they say that their expert didn't need to inspect the devices because he was an expert. He actually said he was not an expert in POS devices. Number two, they say we didn't produce any documents. Of course we didn't because IDT doesn't have documents about their point-of-sale devices. They're controlled by Walgreens and EWI. Two witnesses testified that there were modifications. Finally, they say these devices send information to the next step or the next computer. The question is which computer. In the prosecution history, they say that these devices innately send information to the banking network, and that's what they do. They need to be reprogrammed to send it to the host computer or on to IDT. And there was no evidence of that, Your Honor. Thank you. Okay. Thank you. Thank both counsel. The case is submitted.